## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CRAIG ADAMS,** | : | **CIVIL ACTION NO. 1:21-CV-909** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **HANOVER FOODS CORPORATION** | : | |
| **and JEFF WAREHIME,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Craig Adams alleges eight statutory claims against his former employers, Hanover Foods Corporation and its Chief Executive Officer ("CEO") Jeff Warehime pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.; and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.*  Adams also brings a claim for wrongful discharge in violation of Pennsylvania public policy.  Hanover and Warehime (collectively, "defendants") move to dismiss seven of the nine claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  We will grant the motion.

## I.    Factual Background & Procedural History

Adams worked for Hanover from January 2017 through August 2020 as its Vice President of Quality, Research, and Development.  (See Doc. 1 ¶ 6).  Adams' responsibilities included overseeing a dozen food manufacturing plants as well as "addressing and reporting" food safety issues at the company.  (See id. ¶¶ 16, 22).

Warehime acted as CEO and made disciplinary and termination decisions regarding Hanover employees, including Adams.  (See id. ¶ 4).[1]

## A.    April Richter Termination Allegations

According to the complaint, Warehime pressured Adams to terminate employees without applying the company's progressive disciplinary policy and for reasons that Adams considered "unethical and illegal."  (See id. ¶¶ 7, 8, 13).  For example, Warehime asked Adams to fire a woman named April Richter in September 2018.  (See id. ¶ 7).  Adams refused, believing Richter was performing up to standards and that Warehime did not like Richter because he disliked "successful women who were independent thinkers."  (See id. ¶ 8).  Several months later, Richter purportedly requested medical leave for "anxiety and depression related to the harassment of Warehime."  (See id. ¶ 9).  In October 2019, Warehime again asked Adams to fire Richter, and Adams again refused because he believed the decision was "based on her gender and retaliation."  (See id. ¶ 11).  A different manager allegedly terminated Richter's employment in November 2019 at Warehime's direction.  (See id.)  Following her termination, Richter filed a charge with the Equal Employment Opportunity Commission ("EEOC") and Adams participated in the investigation.  (See id. ¶ 12).

---

[1] The complaint at times refers to "the Warehime family," "the Warehimes," and "the late John Warehime," but no other family member has been named as a party to this lawsuit.  (See id. ¶¶ 25, 26, 33, 36-40, 45, 62).  We use "Warehime" to refer solely to the named defendant, Jeff Warehime.

In addition to Richter, Adams avers he stood up for "employees who were being harassed" at a plant he oversaw in Clayton, Delaware.  (See id. ¶ 77).  Adams alleges Warehime targeted him for termination as a result of his cooperation with Richter's EEOC claim and his support of these employees.  (See id. ¶¶ 12, 77).

### B.     Disability Allegations

Adams suffers from a partially ruptured disc in his back, requiring injections "1 or 2 times per year."  (See id. ¶ 14).  He also experiences "anxiety and depression" as a result of work-related stress.  (See id.)  Per Adams, he frequently needed to stand or stretch during meetings to prevent back pain.  (See id. ¶ 15). Warehime reportedly belittled Adams about his condition.  (See id.)  Adams also avers Warehime exacerbated his mental health conditions.  (See id. ¶ 20).  When Adams took vacation, Warehime allegedly admonished him for not working, which caused Adams "stress and anxiety."  (See id.)  When Adams brought up his stress to Warehime, Warehime purportedly replied by stating "the weak will quit."  (See id.) In July 2020, Adams informed Warehime he would be leaving early for a doctor's appointment, and Warehime "trivialize[d]" Adams' health issues and stated "well I am a doctor, tell me what your problem is."  (See id. ¶ 21).  Adams avers Warehime "berated and harassed him due to his need for treatment."  (See id.)

### C.     Unlawful Discharge Allegations

The complaint contains over 50 allegations related to Adams' food safety responsibilities at Hanover, as well as various issues and setbacks he encountered during his tenure.  (See id. ¶¶ 22-76).  Principally, Adams avers that every Hanover plant was "in extremely poor condition" and Adams submitted many requests for

additional funding to maintain compliance with state and federal food-safety laws. (See id. ¶¶ 22-24). Per Adams, he feared termination because the Warehime family was "verbally abusive" and the source of "tremendous hostilities at work" due to Adams' reporting of food-safety issues. (See id. ¶ 25).

Adams was responsible for a plant in Spring Glen, Pennsylvania, that produced "ready to eat" products. (See id. ¶ 30). Adams alleges that in February 2017, listeria monocytogenes ("listeria") was discovered in the Spring Glen plant. (See id. ¶ 32). The plant also did not meet federal standards for cooling, and Adams requested additional funds for food-safety upgrades. (See id. ¶ 33). Hanover was nonresponsive to these issues in both 2017 and 2018. (See id. ¶¶ 33, 49).

Adams also oversaw plants in Centre Hall, Pennsylvania and Ridgely, Maryland, which both handled frozen vegetables. (See id. ¶ 30). In March 2017, the Centre Hall plant failed an audit, and by August 2017, the food-safety issues had not been resolved. (See id. ¶¶ 35, 41). Adams met with Warehime in December 2017 about Centre Hall and other plants, but his request for capital was denied. (See id. ¶ 44). A month later, product from the Centre Hall and Ridgely plants tested positive for listeria. (See id. ¶¶ 47, 48). In January 2018, Adams held a meeting related to the presence of wood in Vidalia onion product from the Ridgely plant. (See id. ¶ 47). Per Adams, this issue resulted in a lawsuit. (See id. ¶ 57). In July 2020, Centre Hall again experienced listeria issues. (See id. ¶ 75).

Listeria also caused problems at Hanover's plant in Alcosa, Guatemala. (See id. ¶ 39). Adams avers that, in June 2017, the plant needed to hold $1 million of product due to listeria. (See id.) In March and April 2018, these issues continued,

but Adams was eventually able to complete a "list of improvements" in May 2018 at the Alcosa plant. (See id. ¶¶ 52, 55). Per Adams, "all the Hanover Foods frozen [p]lants" experienced listeria issues during his tenure. (See id. ¶ 38).

Swelled cans were problems at two plants Adams oversaw: Aunt Kitty's in Vineland, New Jersey, and Hanover Canning. (See id. ¶¶ 30, 31). After customers complained about swelled cans in February 2017, Adams requested new "dud detectors" at Hanover Canning and had to withdraw some product from the market. (See id. ¶ 31). In February 2018, customers again complained about swelled cans from Aunt Kitty's. (See id. ¶ 51). In April 2019, the United States Department of Agriculture ("USDA") informed Hanover it needed to institute a "Class 1 recall" for swelled cans from the Aunt Kitty's plant. (See id. ¶ 63).

Adams also experienced issues at Bickel's in York, Pennsylvania, which produced chips. (See id. ¶ 30). In March 2017, Adams allegedly discovered "flaking paint and pest control issues." (See id. ¶ 35). One particular Hanover customer communicated various food-safety concerns, including "allergens issues, metal detector issues . . . rancid chips[,] and pest control." (See id. ¶ 36). According to the complaint, Adams requested but did not receive financial support to address the customer's concerns and Hanover lost the business as a result. (See id.) Bickel's also came under fire from the City of York. (See id. ¶ 40). In June 2017, the City of York "threatened legal action" and "criminal action" due to noncompliant wastewater discharge. (See id.) When Adams requested $500,000 to fix the wastewater problem in October 2017, it was purportedly denied. (See id. ¶ 42). Adams eventually attempted to resolve this problem by purchasing used equipment

from Turkey Hill, but he continued to hold meetings about Bickel's wastewater issues. (See id. ¶¶ 44, 64).

The company's "Re-Pack" plant in Hanover, Pennsylvania, dedicated to the frozen repack of vegetables, was purportedly another source of difficulties. (See id. ¶ 30). According to the complaint, Adams convened a meeting in April 2018 to ensure the plant "pack[ed] inventory ahead to cover Chipotle's orders" while a line was nonoperational, but his directives were ignored. (See id. ¶ 53). In January 2020, Re-pack "missed shipments" and experienced listeria issues. (See id. ¶¶ 67, 70).

Lastly, the complaint details the obstacles Adam faced at Hanover's frozen vegetable plant in Clayton, Delaware. (See id. ¶ 30). Adams alleges the plant needed to install a system to monitor peroxyacetic acid in its "flume water," but his request for capital funding was denied. (See id. ¶ 40). He also brought up the need to reduce "the risk of micro contamination" in April 2018, but was unable to resolve the issue until July 2020. (See id. ¶ 54). In November 2018, Adams allegedly sought to deal with arsenic in the plant's water treatment system, but was denied funds. (See id. ¶ 58). In February 2019, the Clayton plant failed an audit. (See id. ¶ 62). Adams also alleges plant management at Clayton was dishonest with him about "issues with micro testing," but Warehime took no action when Adams brought these "fabrications and false reporting" to him. (See id. ¶ 65). In January 2020, the USDA shut down a portion of the Clayton plant "due to roof leaks, condensation, [and] flaking paint," and Clayton also experienced listeria issues. (See id. ¶¶ 68-70). Clayton's listeria issues resulted in a "surprise audit" from the Food and Drug

Administration ("FDA") in February 2020.  (See id. ¶ 71).  Over the summer, Adams avers management refused to cooperate with him "because [defendants] were undermining his position with management" at several plants "for reporting serious food safety issues."  (See id. ¶¶ 73, 75).

Hanover terminated Adams' employment on August 3, 2020.  (See id. ¶ 76).  According to the complaint, Warehime cryptically stated that Adams' termination stemmed from "issues at Clayton."  (See id.)

### D.    Procedural History

Adams initiated the instant lawsuit in May 2021, alleging employment discrimination and wrongful discharge under state and federal law.  Defendants filed a partial motion to dismiss pursuant to Rule 12(b)(6).  The motion is fully briefed and ripe for disposition.

## II.    Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.  **Discussion**

Defendants move to dismiss seven of the nine claims in Adams' complaint: Counts 3 and 6 (ADA and PHRA discrimination), Counts 4 and 7 (ADA and PHRA hostile work environment based on disability), Counts 5 and 8 (ADA and PHRA retaliation based on disability), and Count 9 (wrongful discharge in violation of Pennsylvania public policy).  They do not seek to dismiss Counts 1 and 2, which bring claims of retaliation pursuant to Title VII and the PHRA arising from Adams' participation in the EEOC investigation related to April Richter's termination.  We address the remaining claims *seriatim*.

A.    **ADA Claims**

    1.    ***Discrimination***[2]

The ADA mandates that an employer may not "discriminate against a qualified individual on the basis of disability."  <u>See</u> 42 U.S.C. § 12112(a).  The PHRA also makes it unlawful for an employer to "discharge . . . or to otherwise discriminate against" an employee due to disability.  <u>See</u> 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[3]  To state a *prima facie* claim of discrimination under the ADA, a plaintiff must allege (1) he has a disability, (2) he is a "qualified individual," and (3) the defendant discriminated against him because of his disability.  <u>See</u> <u>Eshelman v. Patrick Indus., Inc.</u>, 961 F.3d 242, 245 (3d Cir. 2019) (citing <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)).  Defendants challenge the factual sufficiency of the claims, arguing Adams has not alleged a disability or any facts to

---

[2] Adams' claims appear to implicate both discrimination and failure-to-accommodate theories.  (<u>See</u> Doc. 1 ¶¶ 96-101, 114-119).  A failure-to-accommodate claim also requires the plaintiff to allege he has a disability.  <u>See</u> <u>Capps v. Mondelez Glob., LLC</u>, 847 F.3d 144, 157 (3d Cir. 2017) (listing elements).  Defendants challenge the sufficiency of Adams' factual allegations of a disability.  (<u>See</u> Doc. 14 at 6-10).  Because this deficiency would also apply to any failure-to-accommodate claim, we will not address that theory separately.

[3] Courts generally review PHRA claims under the same standards as Title I ADA claims.  <u>See</u> <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 499 n.3 (3d Cir. 2010) (citing <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir.1996)).

infer a connection between his disability and termination.[4]  (See Doc. 14 at 6-9).

Under the ADA, a person has a disability if he has "a physical or mental impairment that substantially limits one or more major life activities," or has "a record of such an impairment," or is "regarded as having such an impairment." See 42 U.S.C. § 12102(1).  Major life activities include, *inter alia*, walking, standing, sitting, reaching, lifting, bending, learning, concentrating, thinking, communicating, interacting with others, and working.  See id. § 12102(2)(A); 29 C.F.R. § 1630.2(i). Federal regulations clarify that an impairment "substantially limits" a major life activity if it "limits the ability of an individual to perform a major life activity as compared to most people in the general population."  See 29 C.F.R. § 1630.2(1)(ii); see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010). According to the statute, the definition of disability "shall be construed in favor of broad coverage."  See 42 U.S.C. § 12102(4)(A).  But a diagnosis standing alone is not sufficient to establish a disability without factual allegations about impairment of a plaintiff's major life activities.  See Bialko v. Quaker Oats Co., 434 F. App'x 139, 142 (3d Cir. 2011) (nonprecedential) (citation omitted).

Upon review of the complaint, the court concludes Adams has not sufficiently alleged a disability that substantially limits any major life activities.  He alleges that

---

[4] Although defendants challenge the alleged link between Adams' disabilities and his termination, (see Doc. 14 at 9-10), it is beyond peradventure that "a complaint need not establish a *prima facie* case in order to survive a motion to dismiss."  See Connelly v. Lane Const. Corp., 809 F.3d 780, 788 (3d Cir. 2016). Adams' allegations that Warehime belittled, harassed, and berated him for seeking medical treatment meet the pleading standard.  (See Doc. 1 ¶¶ 15, 21).

he suffers from a "partially ruptured disc" as well as "anxiety and depression due to work related stress," but provides no factual averments suggesting either of these diagnoses substantially impair any activity. (See Doc. 1 ¶ 14). Adams avers he would stand, stretch, or bend during meetings, but this allegation provides no suggestion he was impaired by his back condition. (See id. ¶ 15). The complaint contains no allegations at all about how his stress and anxiety limited any major life activity. We thus conclude the complaint lacks the requisite factual allegations to establish either of Adams' alleged disabilities. See Bialko, 434 F. App'x at 142. These deficiencies are factual in nature, and they are capable of being cured. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007). We will therefore grant defendants' motion to dismiss without prejudice and with leave to amend.

### 2.   *Hostile Work Environment*

The ADA forbids an employer from discriminating against an employee who is disabled in relation to the "terms, conditions, and privileges of employment." See 42 U.S.C. § 12112(a). The PHRA also forbids an employer from disability discrimination "with respect to . . . terms, conditions or privileges of employment or contract." See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[5] To state a claim for hostile work environment under the ADA, a plaintiff must allege (1) he is a "qualified individual with a disability," (2) he suffered "unwelcome harassment," (3)

---

[5] Our court of appeals interprets the PHRA as "identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently." See Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015) (citation and quotation marks omitted).

due to "his disability or a request for an accommodation,"(4) this harassment was "sufficiently severe or pervasive to alter the conditions of his employment," and (5) the employer "knew or should have known of the harassment and failed to take prompt effective remedial action." See Walton v. Mental Health Ass'n, 168 F.3d 661, 667 (3d Cir. 1999); see also Kendrell v. Sec'y United States Dep't of Def., 851 F. App'x 317, 321 (3d Cir. 2021) (nonprecedential) (citing Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017)).

Conduct must "alter the conditions of [the plaintiff's] employment and create an abusive working environment" to be deemed "severe or pervasive." See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). The court inquires into whether conduct in the work environment meets this standard by considering "the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" See Castleberry, 863 F.3d at 264 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Isolated incidents can create a hostile work environment only if they are "extremely serious." See id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Defendants seek to dismiss the hostile work environment claims due to the lack of factual allegations regarding a disability, and because the complaint does not allege sufficiently "severe or pervasive" mistreatment. (See Doc. 14 at 10-12). The complaint avers Warehime belittled Adams due to his back condition, "trivialized"

Adams' health issues, and "berated" Adams for seeking medical treatment.  (See Doc. 1 ¶¶ 15, 21).  According to the complaint, such treatment occurred "as usual" when Adams sought medical treatment.  (See id. ¶ 21).  Adams further avers that Warehime, after Adams relayed information about his stress levels, once replied: "the weak will quit."  (See id. ¶ 20).  In response to Adams' notification of a medical appointment, Warehime allegedly responded "well, I am a doctor, tell me what your problem is."  (See id. ¶ 21).

The complaint does not contain any factual allegations about how often Adams sought treatment and therefore how often Warehime belittled or berated him for doing so.  Construing the complaint in the light most favorable to Adams, it is plausible Warehime's mistreatment of Adams was pervasive, and discovery will produce a more developed record on which to consider the frequency, severity, and possibly humiliating nature of Warehime's mistreatment.  Cf. Castleberry, 863 F.3d at 264; Phillips, 515 F.3d at 233.  We will therefore deny defendants' motion to the extent they argue Adams has not sufficiently alleged severe or pervasive harassment.  As with Adams' discrimination claims, however, we will grant the motion to dismiss these claims without prejudice for Adams' failure to sufficiently allege a disability, and permit Adams leave to amend.  See Fletcher-Harlee Corp., 482 F.3d at 252.

### 3.   *Retaliation*

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by" the ADA, or "because such individual made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing." See 42 U.S.C. § 12203(a).  The PHRA

similarly forbids retaliation for opposition to discriminatory practices or

participation in PHRA proceedings.  See 43 PA. STAT. AND CONS. STAT. ANN.

§ 955(d).[6]  To state a *prima facie* claim of retaliation, a plaintiff must allege he (1) he

engaged in protected activity, (2) the employer took adverse action against him, and

(3) a causal link exists between the protected conduct and the adverse action.  See

Connelly, 809 F.3d at 789.  A plaintiff can show a causal link between a protected

activity and an adverse action by establishing either unusually suggestive temporal

proximity between the two events, or a pattern of antagonism coupled with timing.

See Krouse, 126 F.3d at 504.

Under the ADA, an employer may not retaliate against an employee who in

good faith requests an accommodation.  See Sulima, 602 F.3d at 188 (citing

Shellenberger v. Summit Bancorp., 318 F.3d 183, 191 (3d Cir. 2003)).  Thus, a

request for an accommodation is considered protected activity.  See Shellenberger,

318 F.3d at 191.  The ADA "does not require any formal mechanism or 'magic

words'" to request an accommodation, but an employee "must make clear that [he]

wants assistance for his . . . disability."  See Colwell v. Rite Aid Corp., 602 F.3d 495,

506-07 (3d Cir. 2010) (quoting Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 332

(3d Cir. 2003)).  A request for leave pursuant to the Family Medical Leave Act

("FMLA") may qualify as a request for a reasonable accommodation in some

---

[6] Our court of appeals generally applies the same analytical framework to ADA retaliation claims as to Title VII retaliation claims.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  So too for PHRA retaliation claims. See Connelly, 809 F.3d at 791 n.9 (citation omitted).

circumstances.  See Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017) (citing 29 C.F.R. § 825.702(c)(2)).

In the matter *sub judice*, Adams alleges that on July 21, 2020, he notified Warehime he had scheduled a medical appointment and "would need to leave" early that day.  (See Doc. 1 ¶ 21).  In response, Warehime "berated and harassed" Adams for seeking treatment.  (See id.)  Adams was terminated two weeks later on August 3, 2020, and he alleges retaliation due to his termination "within several weeks of his medical treatment requests."  (See id. ¶¶ 76, 113).  Assuming for purposes of the instant motion that Adams requested FMLA leave, his conversation with Warehime may constitute protected activity.  See Capps, 847 F.3d at 157.  But the complaint does not allege Adams made any leave request—he merely informed Warehime he was leaving work early.  (See Doc. 1 ¶ 21).  This is a factual deficiency capable of being cured, and we will therefore grant the motion to dismiss the ADA and PHRA retaliation claims without prejudice and permit Adams leave to amend. See Fletcher-Harlee Corp., 482 F.3d at 252.

B.    **Wrongful Discharge Claim**

Adams's final claim alleges he was wrongfully discharged in violation of Pennsylvania public policy because "he reported . . . information about food safety issues in the Hanover Manufacturing Facilities," noting that Hanover "was required to be registered" under the Pennsylvania Food Safety Act, 3 PA. CONS. STAT.

§§ 5721-5737.  (See Doc. 1 ¶¶ 132-139).[7]  Defendants contend the Commonwealth does not recognize a cause of action under these circumstances.  (See Doc. 14 at 14-17).  We agree with defendants.

Pennsylvania courts apply "an extremely strong presumption" of at will employment to all non-contractual employment relationships.  See McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 287 (Pa. 2000); Geary v. U. S. Steel Corp., 319 A.2d 174, 175 (Pa. 1974).  Subject to few exceptions, a common-law cause of action for termination of employment does not exist.  See Harrison v. Health Network Lab'ys Ltd. P'ships, 232 A.3d 674, 682 (Pa. 2020) (citing Weaver v. Harpster, 601 Pa. 488, 501, 975 A.2d 555, 562-63 (Pa. 2009) (citing Clay v. Advanced Comput. Applications, Inc., 559 A.2d 917, 918 (Pa. 1989))).  In narrow circumstances, however, a claim for wrongful discharge may arise "where the dismissal would threaten clear mandates of public policy."  See Shick v. Shirey, 716 A.2d 1231, 1234 (Pa. 1998) (citing Geary, 319 A.2d at 180).  The germane public policy "must be applicable directly to the employee and the employee's actions."  See Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 175-76 (Pa. Super. Ct. 1996).

---

[7] Adams also makes passing reference to "Pennsylvania Food Safety guidelines and ethics, and . . . the Pennsylvania Constitution."  (See Doc. 1 ¶ 134). The complaint does not cite to any particular guideline, ethical rule, or constitutional clause, and Adams does not refer to any in his opposition brief.  (See generally Doc. 15).  Thus, to the extent Adams relies on any of them to state a claim for wrongful termination, he has abandoned those theories of recovery.  See Stauffer v. Navient Sols., LLC, 241 F. Supp. 3d 517, 519 n.3 (M.D. Pa. 2017) (Conner, C.J.) (plaintiff's lack of legal support in response to dispositive motion deemed withdrawal of claim).

Pennsylvania courts recognize three limited circumstances where the dictates of public policy overcome the at-will presumption: the employer "(1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."  See Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003), as amended (Jan. 20, 2004) (quoting Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)).  But an employee who alleges he was terminated for complying with a statutorily imposed duty must have "a clear and direct affirmative duty" pursuant to the relevant law.  See Brennan v. Cephalon, Inc., 298 F. App'x 147, 151 (3d Cir. 2008) (nonprecedential) (no duty to report audit findings to FDA); but see Field v. Phila. Elec. Co., 565 A.2d 1170, 1180 (Pa. Super. Ct. 1989) (report to Nuclear Regulatory Commission "was statutorily required").  Furthermore, if a plaintiff claims wrongful discharge under Pennsylvania law by alleging that a *federal* statute has been violated, reference to the federal statute alone is insufficient.  See McLaughlin, 750 A.2d at 289 (employee who alleged termination due to her internal report of Occupational Safety and Health Act ("OSHA") violations failed to state claim).  Instead, the plaintiff must allege that the *Commonwealth's* public policy "is implicated, undermined, or violated" by his termination.  See id.

In the instant matter, Adams alleges defendants wrongfully terminated his employment in contravention of public policy because he oversaw Hanover plants "which were covered under" Pennsylvania's Food Safety Act, 3 PA. CONS. STAT. §§ 5721-5737.  (See Doc. 1 ¶ 134).  Adams' opposition brief also points to a

17

constellation of factual allegations from his complaint, ranging from his calls with the FDA about possible recalls, to meetings with Warehime about Adams' belief that plant managers in Clayton were not being truthful with him. (See Doc. 15 at 13-17). Nowhere in Adams' complaint, however, does he allege he had a statutory duty to comply with any reporting requirements under the Pennsylvania Food Safety Act, or that such a duty even exists. Cf. Fraser, 352 F.3d at 111; Brennan, 298 F. App'x at 151; but see Field, 565 A.2d at 1180. At most, Adams alleges Hanover as a company was "required to be registered" under the statute and follow certain food-safety measures. (See Doc. 1 ¶ 22). This allegation is insufficient to state a claim without any indication the Food Safety Act is "applicable directly to" Adams and his actions. Cf. Hunger, 670 A.2d at 175-76. Adams also does not allege defendants ever directed him to commit any crime, nor does he point to any statute that would make it illegal for defendants to terminate him. Cf. Fraser, 352 F.3d at 111.

Moreover, Adams' oblique references to his interactions with federal officials from FDA and USDA are inapposite. (See Doc. 1 ¶¶ 29, 31, 38, 41, 48, 63, 70). So too are his alleged efforts to achieve an internationally recognized "BRC certification" for a particular facility. (See id. ¶ 32). The Pennsylvania Supreme Court has made clear that "it is a mistake to baldly point to a federal statute or administrative regulation and, without more, proclaim this as the public policy of the Commonwealth, such that every violation of any federal code, or statute becomes the basis for seeking a common law remedy against an employer." See McLaughlin, 750 A.2d at 290. Adams also alleges no federal statute that imposed a

personal duty on him to report food-safety issues to a federal agency.  Cf. Field, 565 A.2d at 1180.

Finally, Adams' many allegations concerning his "food safety reports" refer only to internal reports to Jeff Warehime and the Warehime family.  Adams alleges, *inter alia*, that he feared termination because "he would report deficiencies to the Warehimes," that he and other vice presidents reported issues and submitted funding requests  to Warehime, that he reported the cost of certain food-safety upgrades "but the Warehimes were largely unresponsive," that a failed audit in February 2019 "was reported to the Warehimes," and that he met with Warehime about allegedly dishonest managers at the Clayton plant.  (See Doc. 1 ¶¶ 24, 26, 33, 62, 65).  Adams' averments therefore fall under the umbrella of internal employee reports, first rejected by the Pennsylvania Supreme Court in Geary, 319 A.2d at 180 (no cause of action for internal report about steel pipe safety), and again rebuffed in McLaughlin, 750 A.2d at 288 (same as to internal report of OSHA violations).  The Commonwealth allows a claim for wrongful discharge in contravention of public policy "only in the clearest of cases," and the allegations of Adams' complaint do not meet this stringent standard.  See Weaver, 975 A.2d at 563.  We will grant defendants' motion to dismiss the wrongful discharge claim with prejudice.

**IV.**    <u>**Conclusion**</u>

We will grant defendants' motion (Doc. 13) to dismiss and grant Adams leave

to amend his complaint with respect to his disability claims.[8]  An appropriate order

shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 31, 2022

---

[8] The court notes for the benefit of the parties that the complaint contains numerous technical terms, acronyms, and proper nouns that are never defined. These terms include GMP, SOP, FSMA, KH, NIC, PIT, FM, CAPA, PAA, Condor, NEMA 4, and PPA.  (<u>See generally</u> Doc. 1).  To the extent any of these terms or abbreviations are relevant to claims raised in his amended complaint, the court directs Adams to clarify each and every reference.